No. 100,362

In the Matter of the Care and Treatment of
ROBERT C. ONTIBEROS.
(287 P.3d 855)

Opinion filed August 17, 2012.

*Michael P. Whalen*, of Law Office of Michael P. Whalen, of Wichita, argued the cause and was on the briefs for appellant.

*Kristafer R. Ailslieger*, deputy solicitor general, argued the cause, and *Marc Bennett*, special assistant attorney general, and *Derek Schmidt*, attorney general, were on the briefs for appellee.

The opinion of the court was delivered by

BILES, J.: This appeal arises under the Kansas Sexually Violent Predator Act (KSVPA), K.S.A. 59-29a01 *et seq.* A civil jury declared Robert Ontiberos a sexually violent predator and determined he should be committed for treatment until he is safe for release. The Court of Appeals vacated the commitment and remanded for a new trial because it held that Ontiberos received ineffective assistance of counsel and that the State's attorney committed misconduct during the trial. *In re Care & Treatment of Ontiberos*, 45 Kan. App. 2d 235, 255-56, 247 P.3d 686 (2011). The panel rejected Ontiberos' claim that the KSVPA was unconstitutional. Both sides petitioned for review with this court.

We hold that due process guarantees a person facing civil commitment under the KSVPA a right to counsel at trial, and that person may challenge the effectiveness of his or her trial counsel on direct appeal or under K.S.A. 60-1501. Based on those holdings, Ontiberos' constitutional claim lacks merit. We also hold that his

trial counsel was ineffective and that the State committed miscon-
duct. These holdings require remand for a new trial.

## FACTUAL AND PROCEDURAL BACKGROUND

Ontiberos has two convictions for sexually violent offenses as
defined by the KSVPA. He was convicted of attempted rape in
1983 and aggravated sexual battery in 2001. Ontiberos was charged
with lewd and lascivious behavior in 1991, but that was dropped
in exchange for a guilty plea for possession of cocaine. There were
also two uncharged incidents of alleged sexual misconduct in 1991
and 1999.

Before Ontiberos was released from prison for the aggravated
sexual battery conviction, the State filed a petition alleging he could
be a sexually violent predator as defined by the KSVPA and should
be civilly committed for treatment. Greg Barker was appointed to
represent Ontiberos. The State was represented by a special assis-
tant attorney general appointed from the Sedgwick County District
Attorney's Office. The parties stipulated to probable cause, so the
matter proceeded to trial.

### The Parties' Stipulation

Over 3,500 pages of discovery documents were compiled, but
most are irrelevant to the KSVPA proceedings. The pertinent doc-
uments include: (1) police reports and witness statements from the
three alleged offenses that did not result in convictions; (2) a 2006
discharge summary from a sexual offender treatment program On-
tiberos participated in while imprisoned that contained a Static-99
test result concluding Ontiberos was a "lower risk" to reoffend; (3)
the results from a penile plethysmograph test administered to On-
tiberos in 2005 as part of a sexual offender treatment program; and
(4) documents completed by either clinicians or Ontiberos as part
of his sexual offender treatment programs. All 3,500 pages of dis-
covery were given a single identifying designation as Exhibit 1.

The parties agree that they orally stipulated as to how Exhibit 1
would be used at trial, but now dispute the scope of what was
agreed to, including whether the State was permitted to cross-
examine Ontiberos with documents from Exhibit 1. There is no

written stipulation. The parties agree they stipulated that all documents within Exhibit 1, including clinicians' reports: (1) could be reviewed by the expert witnesses when forming opinions; (2) could be used to examine those expert witnesses at trial; and (3) would be included in the appellate record. The district court did not take possession of the records comprising Exhibit 1, none of the documents referenced at trial were separated and made into another exhibit for more convenient reference in the record, and none of the documents were provided to the jury for its review.

*The Experts' Reports/Testimony*

Prior to trial, the district court ordered a state psychologist to evaluate Ontiberos as authorized by K.S.A. 59-29a05(d). Consistent with the parties' stipulation, the state's psychologist, Dr. Deborah McCoy, reviewed all the discovery documents contained within what became Exhibit 1. She also interviewed Ontiberos. She diagnosed him with paraphilia not otherwise specified, with themes of exhibitionism and nonconsent, as well as a personality disorder not otherwise specified, with antisocial features, polysubstance dependence, and sexual abuse of an adult. The "not otherwise specified" diagnosis means the conditions do not fit into specific diagnostic categories found in the Diagnostic and Statistical Manual of Mental Disorders, DSM—IV. Dr. McCoy concluded that Ontiberos met the criteria of a sexually violent predator under the KSVPA based upon two actuarial risk assessment tests she administered—the Minnesota Sex Offender Screening Tool Revised (MnSOST-R) and the Static-99.

The MnSOST test results placed Ontiberos in a moderate risk category. Under that test, 29 percent of individuals with similar risk factors were rearrested for a new sex offense within 6 years. But Dr. McCoy concluded that Ontiberos fell within the high risk category for sexual recidivism under the Static-99. Dr. McCoy testified Ontiberos' chances of reconviction under that test were 39 percent after 5 years, 45 percent after 10 years, and 52 percent after 15 years. In her report, Dr. McCoy noted her results were different than some previously administered Static-99 assessments, and she indicated she did not know what caused the difference. At

trial, Ontiberos' counsel did not ask Dr. McCoy about any test results that conflicted with her findings, including the test results from the 2006 discharge summary included in Exhibit 1.

Dr. Robert Barnett, also a clinical psychologist, examined Ontiberos as a defense expert. Dr. Barnett reviewed Ontiberos' records "that were provided to [him]" and met with Ontiberos' counsel about the case. Dr. Barnett did not administer the Static-99 or the MnSOST-R because he considered them to be controversial instruments. He explained this by noting that both tests purport to predict the percentage likelihood to reoffend, but if only half of the people like Ontiberos reoffended "[t]here's no way—simply no logical way to say which group [Ontiberos] would fall in[to]." Dr. Barnett also testified the Static-99 and MnSOST-R tend to produce different scores, even though they are supposed to measure the same thing.

Dr. Barnett testified that research had shown two tests to be reliable for deviant responses—the penile plethysmograph and the Hare Psychopathy Checklist Revised. And he said that he wished Larned personnel would use the plethysmograph because they have the equipment to conduct that test. Dr. Barnett was apparently unaware that Ontiberos had taken a plethysmograph in 2005, and that the results were contained in Exhibit 1. Ontiberos' attorney did not ask Dr. Barnett about the 2006 discharge summary's Static-99 results that conflicted with Dr. McCoy's test results.

Dr. Barnett also disputed Dr. McCoy's paraphilia diagnosis because he concluded the most "prominent feature of [Ontiberos'] psychological presentation is his chronic and severe polysubstance abuse and dependence." Ontiberos, he further observed, suffered from a mild "mind cognitive disorder, [and] has a little trouble with confusion, attention and concentration." Dr. Barnett concluded that Ontiberos did not have any sexual dysfunction diagnosis, *i.e.*, he was not a sexually violent offender.

The jury found Ontiberos was a sexually violent predator. He was committed to State custody for treatment until determined to be safe for release. Additional descriptions about the evidence presented and conduct of the trial will be discussed as necessary for the issues presented.

*The Ineffective Assistance of Counsel Hearing*

Ontiberos timely appealed to the Kansas Court of Appeals and was appointed new counsel, who filed a motion alleging Ontiberos received ineffective assistance of trial counsel and requested remand to the district court for an evidentiary hearing under *State v. Van Cleave*, 239 Kan. 117, 716 P.2d 580 (1986) (recognizing appellate court discretion to order remand as an alternative and more expeditious remedy to K.S.A. 60-1507 to pursue ineffective assistance of counsel allegations). Ontiberos alleged a *Van Cleave*-type hearing was necessary because there were no other procedural mechanisms for a person confined under the KSVPA to challenge his or her counsel's performance. The State did not respond to the motion and the Court of Appeals remanded the case "to initiate proceedings related to Appellant's claim of ineffective assistance of trial counsel, pursuant to [*Van Cleave*]." There was no further discussion of the legal basis for the Court of Appeals' remand order.

Once back in the district court, Ontiberos argued that his right to effective assistance of counsel arising from the Sixth Amendment to the United States Constitution was violated due to his attorney's performance errors. He cited the test used to examine ineffective assistance of counsel claims in criminal cases, which was developed under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). He argued trial counsel was ineffective because Barker: (1) stipulated to the admission of otherwise inadmissible documents through Exhibit 1; (2) did not object to the State's use of inadmissible documents, which precluded appellate review of their admissibility; (3) allowed Dr. McCoy to consider inadmissible documents while forming her opinion in violation of *State v. Gonzalez*, 282 Kan. 73, 87, 145 P.3d 18 (2006); (4) allowed the State to cross-examine Ontiberos with documents that were not admitted into evidence—a use Ontiberos alleges was outside the scope of the parties' stipulation; (5) allowed the State to impeach Ontiberos about a non-existent incident involving a knife; (6) failed to understand the conflicting results between the Static-99 tests; and (7) failed to question Dr. McCoy or Dr. Barnett about the 2006 discharge summary's Static-99 test results conclud-

ing Ontiberos was a low risk to reoffend. The State's original trial attorney (Marc Bennett), Ontiberos, and Ontiberos' trial attorney (Barker) each testified.

Regarding the stipulation, Bennett admitted that statements in the police reports in Exhibit 1 would have been hearsay under the rules of evidence, but he claimed he could have gotten them admitted by calling the necessary witnesses: court clerks, a Department of Corrections records custodian, and a Larned records custodian. Bennett explained that Ontiberos' counsel agreed to the stipulation because "there was no sense in jumping through all those [procedural] hoops when I could get it in irrespective." Bennett also testified that he believed the police reports were admissible business records under the hearsay exception in K.S.A. 60-460m. In the alternative, Bennett added that he could have called the individual police officers who were at the scene, specifically mentioning an officer from Ontiberos' 2001 conviction. Bennett further testified that he could have avoided double hearsay problems in the police reports by calling the victims and witnesses to each crime to testify. He said he specifically talked to Ontiberos' mother-in-law, who was the victim of the 2001 aggravated sexual battery conviction, but did not issue a subpoena for her because he believed Ontiberos would not want her testifying.

As to a corrections department discipline report regarding the alleged knife incident the State raised at trial while questioning Ontiberos' expert, Ontiberos testified on remand that he was never disciplined for possessing a weapon. Bennett testified that he perused the 3,500 page record for 20 minutes before the *Van Cleave* hearing and could not find any reference to an incident involving a knife. But he added that he "wouldn't have asked [a question about it] if it didn't come from somewhere."

Ontiberos' trial attorney, Barker, testified that he considered "very thoroughly" whether to stipulate to the documents comprising Exhibit 1 and agreed because he did not want the entire exhibit given to the jury to peruse or have multiple prosecution witnesses piling on cumulative evidence about things contained within the documents. Barker also testified he was unaware of this court's *Gonzalez* decision regarding restrictions on an expert witness' abil-

ity to rely on hearsay evidence when forming an opinion. He further testified he could not recall whether he was aware during the original trial that Ontiberos had taken the Static-99 on different occasions with different results, but said he had reviewed the entire discovery record before trial and did not see anything that would help Ontiberos. He described his trial strategy as:

"to attack the very validity and accuracy of these tests. Therefore, I could not hardly attack one score based upon an invalid system then come in front of the jury with this one you just showed me and say, Oh look, here's a good one. It's either a reliable system or it isn't, and we all have to chose tactics in our trials. I chose the tactic of attacking the very validity of the Static-99 itself. *I would agree that the variation between this test and the one Dr. McCoy did might arguably support that, but I simply chose to attack the primary through Dr. Barnett's expertise.*" (Emphasis added.)

While ruling from the bench on Ontiberos' ineffective assistance of counsel claim, the district court held that even though this was a civil case, the court believed criminal caselaw was applicable and recited the two-part *Strickland* test. The district court further held that Ontiberos received effective assistance of counsel and that neither of the *Strickland* prongs was satisfied. A journal entry from the *Van Cleave* hearing was added to the appellate record at the Court of Appeals' request.

### The Court of Appeals Decision

On appeal, Ontiberos argued the KSVPA was unconstitutional because it did not provide an explicit mechanism to challenge trial counsel's effectiveness. He also argued that he received ineffective assistance of trial counsel and that the State's attorney committed misconduct so egregious that reversal was required.

As to the first point, the Court of Appeals held that Ontiberos had a statutory right to counsel and that an ineffective assistance of counsel claim could be raised through the *Van Cleave* procedure. For those reasons, it denied Ontiberos' claim that the KSVPA was unconstitutional. *Ontiberos*, 45 Kan. App. 2d at 240. But in so ruling, the Court of Appeals went further and held that Ontiberos had no constitutional right to counsel during the KSVPA proceeding because it is civil in nature. 45 Kan. App. 2d at 237 ("respon-

dents resisting commitment do not have a constitutional right to counsel, but do have a *statutory* right").

As to the second and third claims, the panel held that the appropriate standard of review required determination as to whether Ontiberos' right to a fair trial was violated; and then using that standard, it held Ontiberos was denied a fair trial. The court also held that the State's attorney committed misconduct by improperly using portions of Exhibit 1 to cross-examine Ontiberos and by mischaracterizing evidence regarding the "knife incident." 45 Kan. App. 2d at 253-54. The court further held that Ontiberos' trial attorney failed to: (1) object when the State cross-examined Ontiberos with documents from Exhibit 1 that were not admitted into evidence; (2) object when the State impeached Ontiberos with a non-existent discipline report involving a knife; (3) introduce evidence that the 2006 discharge summary's Static-99 test results contradicted Dr. McCoy's findings by concluding Ontiberos was a "low risk" to reoffend; and (4) correct his own witness (Dr. Barnett) when he incorrectly stated Ontiberos had not taken a plethysmograph—the test Dr. Barnett claimed was the most accurate. The Court of Appeals reversed and remanded for a new trial on this basis. 45 Kan. App. 2d at 236.

The State filed a petition for review with this court and Ontiberos cross-petitioned. This court has jurisdiction under K.S.A. 20-3018(b) (review of Court of Appeals decision).

## ANALYSIS

In his cross-petition, Ontiberos continues to assert the KSVPA is unconstitutional because it lacks a mechanism for persons committed under the act to challenge their trial counsel's performance. In the alternative, he argues his civil commitment must be reversed because he received ineffective assistance of counsel and the State's attorney committed misconduct at trial. We address Ontiberos' constitutional arguments first.

The threshold question is whether Ontiberos has a right to counsel arising from the KSVPA, the Due Process Clause of the Fifth and Fourteenth Amendments to the United States Constitution, or Section 18 of the Kansas Constitution Bill of Rights. We hold

he has a right to counsel under the federal and state constitutional due process provisions, but we begin by examining the KSVPA.

*Background*

The KSVPA is a comprehensive statutory scheme for the civil commitment of sexually violent predators originally enacted in 1994. L. 1994, ch. 316, sec. 1. The United States Supreme Court twice approved challenged procedures set out in the act. See *Kansas v. Crane*, 534 U.S. 407, 122 S. Ct. 867, 151 L. Ed. 2d 856 (2002) (holding the KSVPA definition of "mental abnormality" must require proof that a person lacks some control over their behavior but not a total lack of control); *Kansas v. Hendricks*, 521 U.S. 346, 117 S. Ct. 2072, 138 L. Ed. 2d 501 (1997) (addressing whether the Act's definition of mental abnormality satisfied due process and holding the Act "comports with due process requirements").

Like the procedure used in this case, the State usually initiates KSVPA civil commitment proceedings when an inmate is nearing release for a criminal offense qualifying for commitment under the act. The KSVPA requires that the agency with authority over release of individuals who may meet statutory criteria notify the attorney general 90 days prior to release. K.S.A. 59-29a03(a). The attorney general then has the person's records studied by a prosecutor's review committee to make an initial determination whether the person meets the sexually violent predator definition. K.S.A. 59-29a03(e). Based on that assessment, the attorney general may file a petition in the county where the person was convicted, alleging that the person is a sexually violent predator and stating sufficient facts to support the allegation. K.S.A. 59-29a04(a). Once the petition is filed, a judge must determine whether probable cause exists to believe the person is a sexually violent predator and should be taken into custody. K.S.A. 59-29a05(a). Once in custody, a probable cause hearing is required within 72 hours. K.S.A. 59-29a05(b). The detained person has a statutory right to be represented by counsel at the probable cause hearing. K.S.A. 59-29a05(c)(1).

If probable cause is determined to exist and the matter proceeds to trial, the KSVPA provides that a determination that a person is a sexually violent predator must be made beyond a reasonable doubt. K.S.A. 59-29a07(a). And when a court or jury is satisfied beyond a reasonable doubt that person must be committed to the custody of the secretary of social and rehabilitation services "for control, care and treatment until such time as the person's mental abnormality or personality disorder has so changed that the person is safe to be at large," the person is committed indefinitely. K.S.A. 59-29a07(a).

Of interest in this case, K.S.A. 59-29a06(b) provides that "[a]t all stages of the [KSVPA] proceedings . . . any person subject to K.S.A. 59-29a01 *et seq.*, and amendments thereto, *shall be entitled to the assistance of counsel*, and if the person is indigent, the court shall appoint counsel to assist such person." (Emphasis added.) We must consider the strength of that statutory provision next.

### Right to Effective Counsel at the KSVPA Trial

This court has held that when there is a right to counsel there is necessarily a correlative right to effective counsel—regardless of whether the right derives from a statute or the constitution. See *Albright v. State*, 292 Kan. 193, 207, 251 P.3d 52 (2011) ("regardless of the source of the right, a right to counsel, to be meaningful, necessarily includes the right to effective assistance of counsel"); *Brown v. State*, 278 Kan. 481, 484, 101 P.3d 1201 (2004) (recognizing the statutory right to the effective assistance of counsel in a K.S.A. 60-1507 proceeding); see also *Strickland*, 466 U.S. at 686 (" 'the right to counsel is the right to the effective assistance of counsel' "). This caselaw, coupled with the statutory provision for counsel at all KSVPA proceedings in K.S.A. 59-29a06(b), would appear to establish a statutory right to effective counsel.

But the conclusion that K.S.A. 60-29a06(b) establishes a statutory right to counsel is diminished by K.S.A. 59-29a06(e), which follows up the recitation of that requirement by stating "[t]he provisions of this section are not jurisdictional, *and failure to comply with such provisions in no way prevents the attorney general from proceeding against a person* otherwise subject to the [KSVPA]."

(Emphasis added.) Arguably, this language could be read to mean that the failure to comply with the statute regarding assistance of counsel is not a barrier to proceeding against a person under the KSVPA. If so, the provision for counsel in subsection (b) is made less certain by the subsequent subsection (e) in the same statute. And since the Court of Appeals expressly held there is no constitutional right to counsel for KSVPA proceedings, this equivocation in K.S.A. 59-29a06 increases in importance for the issue presented. This compels us to address whether a person is entitled to counsel in a KSVPA proceeding under the constitution.

In holding that Ontiberos does not have a constitutional right to counsel, the Court of Appeals relied on an analogy to this court's K.S.A. 60-1507 caselaw, particularly *Brown*, 278 Kan. at 483. *Ontiberos*, 45 Kan. App. 2d at 237. In *Brown*, this court held prisoners do not have a Fourteenth Amendment Due Process right to counsel in proceedings brought under K.S.A. 60-1507, stating: "We acknowledge that there is no constitutional right to effective assistance of legal counsel on collateral attacks because they are civil, not criminal, actions." 278 Kan. at 483. See *Pennsylvania v. Finley*, 481 U.S. 551, 555, 107 S. Ct. 1990, 95 L. Ed. 2d 539 (1987) (declining to extend the Fourteenth Amendment right to counsel on direct appeal to a prisoner's collateral attack); *State v. Andrews*, 228 Kan. 368, 375, 614 P.2d 447 (1980) (defendant was not entitled to counsel under the Sixth or Fourteenth Amendment for his third motion for new trial); and *Robinson v. State*, 13 Kan. App. 2d 244, Syl. ¶ 4, 767 P.2d 851, *rev. denied* 244 Kan. 738 (1989) (defendant does not have a due process right to counsel to appeal the dismissal of a K.S.A. 60-1507 motion). But while there are some similarities between K.S.A. 60-1507 motions and KSVPA proceedings because they are both civil in nature, they are not identical and the Court of Appeals did not take into account the important dissimilarities.

K.S.A. 60-1507 motions are procedurally distinguishable because prisoners in 1507 proceedings have already been afforded exercise of their Sixth Amendment right to counsel at trial and their direct appeal. And the cases *Brown* cited, particularly the United States Supreme Court's *Finley* decision, did not rely on the civil nature of a defendant's collateral attack upon a conviction when

they held that a defendant does not have a constitutional right to counsel in those proceedings. 481 U.S. at 555. The Court emphasized that a criminal defendant's right to counsel only extends to a defendant's first appeal of right, and no further. 481 U.S. at 556. In other words, the collateral attack is not the criminal defendant's first opportunity to appeal. KSVPA proceedings are original actions, so the lack of previous litigation makes K.S.A 60-1507 proceedings inappropriate analogs.

When determining what due process protections are required in a particular proceeding, this court follows the same three factor test used by the United States Supreme Court. We examine: (1) the private interest affected by the official action; (2) the risk of erroneous deprivation of that interest through the procedures used and the probable value, if any, of additional or substitute procedural safeguards; and (3) the government's interest, including the function involved and the fiscal and administrative burdens the additional or substitute procedural requirements would entail. *In re J.D.C.*, 284 Kan. 155, 166-67, 159 P.3d 974 (2007); see *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976). And the United States Supreme Court has provided some guidance on when the federal due process clause creates a right to counsel.

Due process is not a technical concept with fixed content unrelated to time, place, and circumstances. Instead, its requirements are " 'flexible and [call] for such procedural protections as the particular situation demands.' " 424 U.S. at 334. And "[t]he pre-eminent generalization that emerges from [the United States Supreme Court's] precedents on an indigent's right to appointed counsel is that such a right has been recognized to exist only where the litigant may lose his physical liberty if he loses the litigation." *Lassiter v. Department of Social Services*, 452 U.S. 18, 25, 101 S. Ct. 2153, 68 L. Ed. 2d 640 (1981). The right to counsel is triggered by the defendant's interest in personal freedom, not just the Sixth and Fourteenth Amendment right to counsel in criminal cases. 452 U.S. at 25. A litigant's right to appointed counsel diminishes as the litigant's interest in personal liberty diminishes. 452 U.S. at 26.

But the Due Process Clause does not always require the provision of counsel in civil proceedings when incarceration is threatened. See *Turner v. Rogers*, 564 U.S. 431, 131 S. Ct. 2507, 2518, 180 L. Ed. 2d 452 (2011). In *Turner*, the Court recently held there is no automatic right to counsel in a child support proceeding, which could result in a parent's 1-year imprisonment, as long as sufficient alternative procedures are provided. 131 S. Ct. at 2519.

The Court has not addressed the right to counsel in a sexually violent predator proceeding, but it has addressed this right in a civil commitment proceeding based on a mental disease. *Vitek v. Jones*, 445 U.S. 480, 100 S. Ct. 1254, 63 L. Ed. 2d 552 (1980). In that case, a prisoner challenged a statute allowing his transfer to a mental hospital for the duration of his sentence if a physician or psychologist determined he suffered from a mental disease and the prison lacked the resources to provide treatment. Under that statutory scheme, the prisoner could be held in a mental hospital until his sentence expired unless treatment was no longer necessary. If the State wanted to retain the prisoner in a mental hospital after his or her sentence expired, it would have to initiate civil commitment proceedings at that time. 445 U.S. at 483-84.

A majority of the *Vitek* Court recognized that the transfer to a mental hospital "implicates a liberty interest protected by the Due Process Clause." 445 U.S. at 487. But the majority split as to whether due process required a right to legal counsel or simply required "independent assistance" of some kind. Four of the five justices ruling on the issue held that Vitek had a right to counsel. 445 U.S. at 497. The fifth justice determined that due process only required an independent advisor who did not have to be a lawyer. 445 U.S. at 499 (Powell, concurring in part). The remaining justices dissented, arguing the issue was moot. 445 U.S. at 500.

While *Vitek* is not dispositive of the issue in this case, it is strong authority for finding that Ontiberos has a due process right to counsel. And it has been used by other courts considering the same issue raised by Ontiberos to hold that such a right exists. For example, the Virginia Supreme Court determined that sex offenders have a due process right to counsel at all stages of the proceeding, including the appeal, based upon *Vitek* and application of the three

*Mathews* factors. *Jenkins v. Director, Va. Ctr. For Behav. Rehab.*, 271 Va. 4, 624 S.E.2d 453 (2006).The *Jenkins* court held that right exists under both the federal and Virginia Constitutions, and it based its holding on the "substantial liberty interest at stake in an involuntary civil commitment." *Jenkins*, 271 Va. at 16; see also *Ibur v. State*, 765 So. 2d 275, 276 (Fla. Dist. App. 2000) ("Because involuntary commitment is a substantial deprivation of liberty at which fundamental due process protections must attach, the patient cannot be denied the right to be present, to be represented by counsel, and to be heard."). We agree that an examination of the three *Mathews* factors supports finding that the federal and Kansas due process clauses establish a right to counsel in KSVPA proceedings. We consider those factors next.

The first factor—the private interest affected by the KSVPA proceedings—supports holding that a due process right exists. Ontiberos' liberty is the private interest affected, and stronger due process rights attach to liberty interests. Indeed, it is difficult to conceive of a stronger liberty interest because Ontiberos' confinement has the potential of being indefinite and it includes participation in a sex offender treatment program while committed to state custody. Ontiberos' interest is certainly greater than the prisoner's interest in *Vitek* because Ontiberos would be free from state custody were it not for the KSVPA proceeding, whereas Vitek would have been transferred back to prison. Therefore, Ontiberos' private interest is substantially constricted by the KSVPA proceedings.

The second factor—the risk of the erroneous deprivation of that interest—does not weigh as strongly in Ontiberos' favor as the first. The KSVPA provides several protections to ensure that persons are not wrongly determined to be sexual predators and committed under the Act. See K.S.A. 59-29a05 (right to probable cause hearing with counsel and the opportunity to present evidence); K.S.A. 59-29a06(b) (right to counsel "[a]t all stages of the proceedings" and access to a qualified expert at the State's expense); K.S.A. 59-29a07 (must prove beyond a reasonable doubt). One important consideration is whether the State is represented by counsel at the KSVPA commitment proceeding. See *Turner*, 131 S. Ct. at 2518-

20 (holding indigent individual subject to a child support order and facing incarceration does not have a right to counsel in part because the State is not represented by an attorney either). Since the State is represented by counsel at the KSVPA proceeding, the person the State seeks to commit should also have access to an attorney.

The third factor is the government's interest in the proceedings and the fiscal and administrative burdens appointment of counsel would entail. The burden of providing counsel is small when compared to the substantial liberty issue at risk here. In addition, the various protections and provisions benefiting a person subject to these proceedings that are provided by the KSVPA certainly imply that the legislature perceived a person's substantial stake in the process and its outcomes.

We hold that the caselaw and the *Mathews* factors support a holding that Ontiberos has a due process right to the appointment of counsel at the KSVPA trial. The Court of Appeals erred by holding otherwise. And since we have held that there is a constitutional right to assistance of counsel in KSVPA proceedings, our caselaw instructs that this right carries with it a correlative right to competent, effective counsel. *Albright*, 292 Kan. at 207; *Brown*, 278 Kan. at 484. Based on these holdings, we need not delve further into the statutory provisions.

*Ability to Challenge Effectiveness of KSVPA Trial Counsel*

Ontiberos argues there is no way to challenge ineffective assistance of counsel on direct appeal and argues further that ineffective assistance cannot be the subject of a collateral attack through the habeas corpus statute, K.S.A. 60-1501. The State points out that Ontiberos, in fact, did bring such a claim on direct appeal. Ontiberos counters that the Court of Appeals had no authority to grant his motion for a *Van Cleave*-type hearing. We begin by examining the procedure used in this case and the authority for it.

In *Van Cleave*, the defendant received new counsel to directly appeal his criminal conviction, and his appellate counsel argued for the first time on appeal that Van Cleave's trial counsel was ineffective. This court held that allegations of ineffective assistance of counsel would not be considered for the first time on appeal be-

cause the trial court, which observed counsel's performance and knew the trial strategy, was in a better position than the appellate courts to consider counsel's competence. 239 Kan. at 119. But this court also held that appellate courts have discretion to remand to the trial court for an evidentiary hearing on the ineffective assistance of counsel claim to avoid the expense and delay of a separate K.S.A. 60-1507 action later. 239 Kan. at 119. Against this background, we must consider whether *Van Cleave* has application to a KSVPA proceeding, so that an appellate court considering a person's direct appeal of a commitment can know whether it is permitted to order a remand to the district court to consider ineffective assistance of counsel claims.

The obvious distinction from *Van Cleave* is that K.S.A. 60-1507 would not apply to a KSVPA proceeding. See K.S.A. 60-1507(a) (defining statute's scope as extending to a prisoner in custody under a sentence). But the State argues that K.S.A. 60-1501 applies to persons committed under the KSVPA. It cites *Johnson v. State*, 289 Kan. 642, 215 P.3d 575 (2009), in which two persons committed under the KSVPA filed a petition under K.S.A. 60-1501 alleging the Sexual Predator Treatment Program was constitutionally inadequate to cure their conditions, resulting in their eventual release. 289 Kan. at 644. In that case, this court held that a person confined under the KSVPA "is included within the purview of K.S.A. 60-1501 and, as a result, may bring a habeas corpus petition alleging due process violations." 289 Kan. at 648. Ontiberos argues K.S.A. 60-1501 only applies if the committed person is challenging the conditions of confinement, such as the allegations made by the petitioners in Johnson about their treatment program.

Ontiberos' claim lacks merit because it contradicts the plain language of the 60-1501 statute and is premised mostly on the fact that Ontiberos is the first litigant to attempt to raise 60-1501's application to issues not premised on conditions of confinement. But novelty is not infirmity. The relevant portion of K.S.A. 60-1501(a) states:

"Subject to the provisions of K.S.A. 60-1507. . . *any person in this state who is detained, confined, or restrained of liberty on any pretense whatsoever,* . . . physically present in this state may prosecute a writ of habeas corpus in the supreme

court, court of appeals or the district court of the county in which such restraint is taking place." (Emphasis added.)

The statute's plain language provides a remedy to any detained person who is excluded from K.S.A. 60-1507's provisions. And while Ontiberos is correct that *Johnson* can be distinguished because it involved prisoners challenging conditions of confinement, it is nevertheless strong support that persons detained under the KSVPA may utilize 60-1501 to challenge the effectiveness of trial counsel. The Court of Appeals interpreted *Johnson* to hold that a sexually violent predator may seek relief under K.S.A. 60-1501 for any challenges to the legal process due, including the effective assistance of counsel. *Ontiberos*, 45 Kan. App. 2d at 239. We agree.

We hold that a person detained under the KSVPA may raise an ineffective assistance of trial counsel claim on direct appeal using the *Van Cleave* remand procedure or through a collateral attack using K.S.A. 60-1501. Ontiberos' claim that the KSVPA is unconstitutional is without merit. We next consider whether Ontiberos received the effective assistance of counsel to which he was entitled at his KSVPA trial.

### *Application of* Strickland

Ontiberos cites numerous trial errors amounting to the ineffective assistance of counsel, but the threshold question is what test applies to his claim. The State urges us to adopt the two-prong ineffective assistance of counsel test for deficient performance claims established in criminal cases under *Strickland v. Washington,* 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Ontiberos cited *Strickland* to the district court and the Court of Appeals, but he argues to this court that a more stringent test established by the Montana Supreme Court in *In re K.G.F.,* 306 Mont. 1, 7, 29 P.3d 485 (2001), applies. The lower courts disagreed on the applicable test. The district court held Ontiberos' counsel was not ineffective using the two-prong *Strickland* standards. The Court of Appeals examined Ontiberos' ineffective assistance of counsel claims under a right-to-fair-trial framework because the KSVPA is a civil proceeding.

We hold that the two-prong *Strickland* test applies because Ontiberos' right to counsel arises from a constitutional right similar to the rights attendant to a criminal trial. We begin by explaining why we decline to adopt the fair trial framework for Ontiberos' ineffective assistance of counsel claims, and then we address the misconduct allegations.

In *Smith v. Blakey, Administrator*, 213 Kan. 91, 515 P.2d 1062 (1973), the driver of an automobile sued the automobile's owner for personal injuries stemming from an accident. On appeal, the owner claimed the trial court erred by permitting opposing counsel to verbally abuse and attack defense counsel in front of the jury. The *Smith* court held counsel's remarks resulted in reversible error when the parties have been denied a fair trial. 213 Kan. at 96. The *Smith* court reversed after it found "the remarks and conduct of [opposing] counsel materially distracted and hindered the jury from returning an impartial verdict." 213 Kan. at 96.

This same fair trial standard has been applied in subsequent cases when a civil litigant alleged opposing counsel committed misconduct. See *McKissick v. Frye*, 255 Kan. 566, 876 P.2d 1371 (1994) (opposing counsel's remarks are reversible error if the parties have not had a fair trial); *Sledd v. Reed*, 246 Kan. 112, 117, 785 P.2d 694 (1990) (same); *Henderson v. Hassur*, 225 Kan. 678, 693, 594 P.2d 650 (1979) (same); *Kleibrink v. Missouri-Kansas-Texas Railroad Co.*, 224 Kan. 437, Syl. ¶ 6, 581 P.2d 372 (1978) (same). And this court adopted the same fair trial analysis in another KSVPA appeal involving the state attorney's misconduct. *In re Care & Treatment of Foster*, 280 Kan. 845, Syl. ¶ 2, 127 P.3d 277 (2006). We must now decide whether that fair trial analysis should be extended to claims by persons committed under the KSVPA alleging ineffective assistance of counsel.

The State urges us to adopt the *Strickland* standard applicable in criminal cases because it is well-known and easy to apply. Numerous other jurisdictions use *Strickland* for claims of ineffective assistance of counsel raised by persons committed under that state's sexually violent predator law. See, *e.g.*, *Jenkins*, 271 Va. at 16 (recognizing a constitutional right to effective counsel and evaluating the claim under *Strickland*); *State of Texas for the Best In-*

*terest and Protection of H.W.*, 85 S.W.3d 348, 356 (Tex. App. 2002) (same); *People v. Rainey*, 325 Ill. App. 3d 573, 585-86, 759 N.E.2d 492 (2001) (recognizing statutory right to effective counsel and evaluating that claim under *Strickland*); *In re Crane*, 704 N.W.2d 437, 439 (Iowa 2005) (same); *In re Alleged Mental Illness of Cordie*, 372 N.W.2d 24, 29 (Minn. App. 1985) (same). These courts applied *Strickland* regardless of whether that court held that the person's right to effective counsel arose from statute or the constitution.

Most of these cases lack any significant analysis as to why *Strickland* was adopted, but the Washington Court of Appeals explained that it found the *Strickland* analysis appropriate in civil commitment proceedings, even though it is "rooted in Sixth Amendment protections," in part because the *Strickland* standard is well known, supported by a well-developed body of caselaw, and the majority of jurisdictions follow it. *In re Detention of T.A.H.-L*, 123 Wash. App. 172, 180, 97 P.3d 767 (2004). The one exception appears to be the Montana Supreme Court's analysis in *In re K.G.F.*, which Ontiberos now urges us to apply.

In the Montana case, the civil litigant was involuntarily committed after a court determined she had a mental disorder and was a danger to herself. She was not a sexually violent predator. The *K.G.F.* court rejected the *Strickland* standard because " 'reasonable professional assistance' cannot be presumed in a proceeding that routinely accepts—and even requires—an unreasonably low standard of legal assistance and generally disdains zealous, adversarial confrontations." 306 Mont. at 8. The court continued by saying the *Strickland* requirement of proving that counsel's performance prejudiced the defense "is contrary to [Montana's caselaw] that mandates that unless civil commitment laws are strictly followed, a commitment order must be reversed." 306 Mont. at 8. Finally, it held *Strickland* was inappropriate because it was designed to protect a defendant's Sixth Amendment rights and the "involuntary commitment process does not invoke those constitutional provisions." 306 Mont. at 8-9.

The *K.G.F.* court considered five factors, which it adopted from portions of the National Center for State Courts' Guidelines for Involuntary Civil Commitment, as to whether: (1) competent coun-

sel was appointed; (2) counsel conducted a thorough review of all records; (3) counsel knew what the client wanted to occur; (4) the client knowingly and voluntarily talked to the clinicians and/or was the client advised of the right to remain silent or attend the examination; and (5) counsel vigorously advocated for his or her client. 306 Mont. at 16-19.

The Montana court's criticism of *Strickland* appears partially based on the abbreviated, 2-day time frame in which persons found to be a danger to themselves are civilly committed under Montana's commitment statutes. 306 Mont. at 8 ("[T]he conduct of counsel during those few available hours prior to an involuntary commitment hearing or trial should be a key focal point of the inquiry as to whether the counsel's representation was effective."). But that process is distinguishable from KSVPA proceedings because counsel has substantially more time to prepare under the KSVPA since the statute requires a trial within 60 days of the probable cause hearing. K.S.A. 59-29a06(a).

Notably, no other jurisdiction follows the Montana court's approach. See *In re Daryll C.*, 401 Ill. App. 3d 748, 930 N.E.2d 1048 (2010) (declining to adopt the Montana court's approach because it was grounded in Montana constitutional and statutory law); *In re L.G.*, No. 06AP-453, 2006 WL 2780157, at *8 (Ohio App. 2006) (unpublished opinion) (rejecting the Montana Supreme Court's approach and applying the *Strickland* standard); *In re Detention of T.A.H.-L*, 123 Wash. App. at 180 (declining to adopt the Montana Supreme Court's dim view of the quality of civil commitment proceedings, or their adversarial nature, in the state of Washington). Likewise, we decline to adopt in Kansas such a critical and limited view of the *Strickland* standards.

Although there is some merit to applying the fair trial rubric this court adopted in *Smith*, 213 Kan. 91, to address claims of misconduct by opposing counsel, we hold that the well-known *Strickland* test better addresses the concerns embodied in ineffective assistance of counsel claims in KSVPA proceedings. The United States Supreme Court crafted *Strickland* to determine when counsel's performance violates a criminal defendant's Sixth Amendment right to counsel, and it makes sense to apply the same standard

based on a Fourteenth Amendment right to counsel. *Strickland* was adopted in this context by the majority of other jurisdictions, and it is a well-known standard likely to invite a more consistent application by Kansas courts. Drawing from *Strickland,* we hold that a finding of ineffective assistance of counsel based on deficient performance in a KSVPA proceeding requires a determination that (1) counsel's performance was deficient; and (2) counsel's deficient performance was sufficiently serious to prejudice the respondent and deprive him or her of a fair trial. We address next whether Ontiberos' trial counsel was ineffective using the *Strickland* standard.

*Ineffectiveness of Trial Counsel*

Ontiberos argues his trial counsel was ineffective because he: (1) failed to use evidence corroborating Ontiberos' expert's testimony and impeaching the State's expert; (2) stipulated that Dr. McCoy could review all documents contained in Exhibit 1, including hearsay reports by other clinicians, when testifying and forming her opinion on whether Ontiberos met the criteria of a sexually violent predator; (3) failed to object when the State cross-examined Ontiberos based on information derived from Exhibit 1 because the exhibit was never introduced into evidence; and (4) allowed Dr. Barnett to be impeached with a corrections department discipline record involving a duct-taped knife, which Ontiberos alleges does not exist. The State disputes all of these claims.

*Standard of Review*

The same standard of review adopted to review a criminal defendant's ineffective assistance of counsel claim applies here. Ineffective assistance of counsel claims involve mixed questions of law and fact requiring de novo review. *Thompson v. State,* 293 Kan. 704, 715, 270 P.3d 1089 (2011). It is incumbent upon the movant to prove that (1) counsel's performance was deficient, and (2) counsel's deficient performance was sufficiently serious to prejudice the defense and deprive the movant of a fair trial. 293 Kan. at 715.

"The first prong of the test for ineffective assistance of counsel requires a defendant to show that counsel's representation fell below an objective standard of reasonableness, considering all the circumstances. Judicial scrutiny of counsel's

performance must be highly deferential, and a fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. We must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. [Citation omitted.]

"Once a defendant has established counsel's deficient performance, the defendant also must establish prejudice by showing that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. A court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. [Citation omitted.]" *Bledsoe v. State*, 283 Kan. 81, 90-91, 150 P.3d 868 (2007).

Since the district court conducted an evidentiary hearing on Ontiberos' motion, we review any factual findings for substantial competent evidence and evaluate whether those findings support the trial judge's conclusions of law. See *Thompson*, 293 Kan. at 715-16 (reviewing K.S.A. 60-1507 evidentiary hearing). The district judge's legal conclusions are reviewed de novo. See *Gonzales*, 289 Kan. at 358-59.

*Failure to Introduce Corroborating Evidence*

Exhibit 1 contains results from a Static-99 administered to Ontiberos in 2006 as part of Ontiberos' sexual offender treatment program. Those 2006 results showed Ontiberos had only a 9 percent chance of reconviction in 16 years and concluded he was a lower risk to re-offend. The 2006 results contradicted the results from the Static-99 administered by the State's witness, Dr. McCoy. She testified that Ontiberos fell into the high risk category for sexual recidivism in part because Ontiberos had a 52 percent chance of reconviction in 15 years. Ontiberos argues his trial counsel was ineffective because he failed to admit into evidence the 2006 Static-99 test results, so the jury was never made aware of it. And even if the lower score was not independently relevant, Ontiberos argues the contradictory results would have supported his trial strategy of discrediting the test's general reliability. The State argues the omission of the more favorable 2006 Static-99 test results would have contradicted Ontiberos' trial strategy.

At the *Van Cleave* hearing, Ontiberos' trial counsel testified it would have hurt his trial strategy to admit the contradictory test scores because he could not claim one score was reliable while Dr. McCoy's results were not. But counsel seemed to recognize the problem with that argument when he admitted the contradictory Static-99 results could "arguably" have supported his claim that the test was unreliable. The district court did not make any findings related to this issue, and we regard Barker's explanation to be nonsensical.

Dr. McCoy's testimony that Ontiberos fell in the high risk category on the Static-99 was among the more damaging evidence presented at trial because she testified Ontiberos was only in the "moderate risk" category on the MnSOST. Not only would the contradictory 2006 Static-99 test scores support Dr. Barnett's testimony that those tests are unreliable, but it would diminish the credibility of Dr. McCoy's conclusion that Ontiberos was a high risk for recidivism. The failure to admit the 2006 test results falls below an objective standard of reasonableness regardless of whether it resulted from what trial counsel characterized as "strategy" or from trial counsel's after-the-fact rationalization for failing to familiarize himself with the evidence.

We are similarly troubled that Ontiberos' attorney did not alert his expert that Ontiberos was given a penile plethysmograph test as part of a sexual offender treatment program in 2005. Dr. Barnett testified that was a more reliable test, and we cannot be certain how it would have affected his diagnosis or testimony. But as the Court of Appeals held, this omission again calls Barker's pre-trial preparation into serious question. 45 Kan. App. 2d at 255. The first prong of the *Strickland* test is satisfied. We will address the second prong after determining whether trial counsel's performance fell below an objective standard of reasonableness based on Ontiberos' other claimed performance errors.

*Stipulation to Expert's Review of Evidence*

Ontiberos next argues his trial counsel was ineffective for stipulating that Dr. McCoy could review all the discovery contained in Exhibit 1, including hearsay and documents created by other cli-

nicians, when forming her expert opinion on whether Ontiberos was a sexually violent predator.

At the time of Ontiberos' trial, the KSVPA was silent regarding what evidence experts could rely upon when forming their opinions. That would later change. See K.S.A. 2011 Supp. 59-29a06(c) (effective July 1, 2011, allowing expert witnesses in KSVPA proceedings to consider inadmissible evidence if certain conditions are satisfied). The general statute governing expert opinion testimony, K.S.A. 60-456(b), applied instead. It states:

"If the witness is testifying as an expert, testimony of the witness in the form of opinions or inferences is limited to such opinions as the judge finds are (1) based on facts or data perceived by or personally known or made known to the witness at the hearing and (2) within the scope of the special knowledge, skill, experience or training possessed by the witness." K.S.A. 60-456(b).

At that time, this court's K.S.A. 60-456(b) caselaw clearly precluded experts testifying in KSVPA proceedings from giving an opinion based on facts or data not " 'perceived by or personally known or made known' " to the expert at trial. *State v. Gonzalez*, 282 Kan. 73, 87, 145 P.3d 18 (2006). In *Gonzalez*, an expert witness relied upon California medical records to form an opinion whether Gonzalez was competent to stand trial. This court held that the psychologist's opinion was not based on facts or knowledge personally made known to her, nor was it based on facts put into evidence because the State never offered the California records for admission under one of the hearsay exceptions. Therefore, the records were inadmissible hearsay. 282 Kan. at 96.

Emphasizing the clarity of *Gonzalez*, this court criticized the same type of stipulation as entered into at Ontiberos' trial in another KSVPA case, *In re Care & Treatment of Colt*, 289 Kan. 234, 243, 211 P.3d 797 (2009) (" '[E]xperts' opinions based upon hearsay are not admissible in any court proceedings.' "). In that case, the parties entered a similar stipulation allowing the State's expert to rely on inadmissible hearsay evidence. The court declined to reverse Colt's civil commitment holding that the error was invited. But this court stated:

"Admission of unreliable statements by out-of-court declarants to prove the truth of the matter asserted is exactly what the hearsay rule is designed to prevent; this

agreement appears to have eliminated any useful purpose our enforcement of the rule might serve; waived any initial objection to the Rosenberg's reliance on and reference to the records; and, to the extent admission of his opinion was error, invited it." *Colt*, 289 Kan. at 243.

During the *Van Cleave* hearing for Ontiberos, his trial attorney admitted that he was not familiar with *Gonzalez*, and this failure to familiarize himself with the requirements for expert testimony undoubtedly led him to enter into such an all-encompassing stipulation.

Parties are obviously encouraged to enter into stipulations to avoid undue costs or time consuming litigation when there is no real dispute. *Fuller v. Wright*, 106 Kan. 676, 680, 189 P. 142 (1920) (stipulations are commendable to shorten or eliminate certain matters of fact not seriously in dispute although tedious or expensive to prove). But counsel's willingness to simply agree to foundation and wholesale use by Dr. McCoy is more than puzzling. As discussed below, some of the documents involved witness statements from uncharged events dating back to the 1990s and clinical reports from individuals at the prison that lack all of the author's identifying information.

In light of the caselaw existing at the time, we are skeptical that the State could have admitted all of the information it claims it could have admitted. But we do not need to reach that issue because Barker's admission that he was unfamiliar with *Gonzalez* and his decision to grant the State free rein over all evidence—however remote or incomplete—falls below the objective standard of reasonableness for an attorney under these circumstances.

In *State v. Rice*, 261 Kan. 567, 932 P.2d 981 (1997), this court held that defense counsel's performance fell below an objective standard of reasonableness when he advised his client not to testify because counsel mistakenly believed the defendant's prior convictions would become admissible if he testified. This court held that this advice was not "based on any justifiable strategic considerations" but was instead based on an incorrect understanding of the law. 261 Kan. at 607. Likewise, Barker's failure to familiarize himself with this court's *Gonzalez* decision caused him to enter a stipulation allowing Dr. McCoy to review all of Exhibit 1 without first

understanding the evidentiary rules governing what evidence she could use when forming her opinions and testifying.

*Failure to Object to Cross-examination*

Ontiberos argues next that his attorney was ineffective for not objecting when the State improperly cross-examined him by using documents in Exhibit 1 without admitting the documents into evidence for the jury's review. We begin by determining whether the State should have admitted the documents into evidence. Ontiberos raises numerous instances of what he characterizes as improper cross-examination, but we will focus on those in which our review of the record demonstrates a problem. These generally occur when Ontiberos testified that he could not remember whether the State's assertions were true or he disagreed with the factual premises underlying a State question. That testimony must be described in greater detail.

First, the State purported to use a police report from 1999 containing a victim's statement that Ontiberos approached a woman named Paula and said, "I want some pussy." Ontiberos was never charged, and he testified at trial that he did not remember making the statement. Then, the State asked, "But you do remember the police contacting you, asking you if you were involved in that, if you'd done that, correct?" And Ontiberos replied, "No, sir." Finally, the State inquired whether Ontiberos remembered telling the police that he was staying with a friend and he did not know "Paula." Ontiberos again testified he did not remember anything about the alleged incident. The State did not admit into evidence the police report or any other evidence establishing that these events actually transpired.

Second, the State inquired about another uncharged incident occurring in 1991 when Ontiberos allegedly took his clothes off and stood naked, staring at a neighbor through a sliding glass door. Ontiberos testified he remembered the incident, but he thought he was wearing shorts. And the State tried to impeach that claim with the officer's statement in the police report, stating:

"If the police reports indicate . . . he made no effort to conceal his genital area and walked up the stairs in a sort of—they call it a strutting manner, do you have any disagreement with that? Is that the way you remember it?"

Ontiberos again testified he remembered leaving, but he thought he had shorts on. The State then asked whether Ontiberos had said, "Charlie's going to get you," when the police asked him to get dressed. Ontiberos denied making that statement. The police report was not admitted into evidence or shown to Ontiberos so that he could review it and respond to its version of the alleged events.

Third, the State asked Ontiberos about a time he left a residential drug treatment facility without authorization. Ontiberos admitted he left the facility, but he denied that he was picked up 8 days later at his in-laws' house. Ontiberos claimed he was only gone 1 day. The State attempted to impeach him by asking, "If the records indicate it was a matter of several days, your memory's [sic] different than that at least?" And Ontiberos again indicated it had happened the same day. No document was admitted into evidence establishing whether the State was correct.

Fourth, Ontiberos complains the State impeached him with statements he made in 1983 to a corrections department counselor about the attempted rape conviction. Ontiberos testified he remembered being at the victim's house, taking his clothes off, and walking down the hall, but then he blacked out because of drug use. The State asked whether he remembered telling a psychiatrist the victim picked up a knife. Ontiberos testified he did not remember. The State continued this line of questioning by asking Ontiberos six questions about statements the counselor reported that he allegedly made in 1983, and Ontiberos testified that he could not remember each time. The counselor's report was never admitted into evidence, and the State now concedes the follow-up questions may have "overreached" because Ontiberos indicated he did not remember.

Fifth, Ontiberos argues the State improperly impeached his expert, Dr. Barnett, in the same fashion. For example, when the State was attempting to show Ontiberos had numerous disciplinary actions in prison and was not truthful about the number of the violations during his interview with Dr. Barnett, the State asked whether Dr. Barnett knew Ontiberos had been in a fight in 2003. Dr. Barnett testified that it would be unusual for someone impris-

oned as long as Ontiberos to not have been in a fight, seemingly conceding that the fight occurred. But the State did not admit any evidence that Ontiberos had been in a fight in 2003, effectively impeaching Ontiberos and Dr. Barnett without establishing a basis for it.

Finally, the State asked Dr. Barnett whether Ontiberos reported "that he was listed in a disciplinary report as having taken duct tape and wrapped it around a pen in order to fashion a crude knife of some kind . . . did he tell you about that?" Dr. Barnett testified Ontiberos had not disclosed that incident, again seemingly conceding that the incident had occurred and that Ontiberos had been dishonest. But as the Court of Appeals opinion thoroughly discusses, Ontiberos was never disciplined for having a knife. And, at trial, the State claimed this incident occurred in 2003, but the discipline report the State later claimed established the basis for its question was a 1991 report, which actually concluded that Ontiberos had "less dangerous" contraband. There is no mention of a knife. The Court of Appeals rightly found this error to be one of the most egregious concluding "this leading question was not based on fact." *Ontiberos*, 45 Kan. App. 2d at 254.

In *State v. Gauger*, 200 Kan. 515, 438 P.2d 455 (1968), this court held that it is improper for counsel to read or refer to the contents of written matter that has not been introduced into evidence for impeachment, stating:

"Where the impeaching statement is written, and the witness, although admitting that he gave a statement, cannot remember the contents thereof, or will neither admit nor deny the same, there is ample foundation for admitting the statement itself or at least the impeaching portion thereof into evidence. . . .

". . . Counsel may comment on the credibility of a witness where his remarks are based on facts appearing in the evidence; *but it is highly improper for the court to permit counsel to read or even refer to the contents of written matter not in evidence for the purpose of impeachment."* (Emphasis added.) 200 Kan. at 520.

In *State v. Ward*, 31 Kan. App. 2d 284, 64 P.3d 972, *rev. denied* 276 Kan. 974 (2003), the defendant argued the trial court abused its discretion by allowing the State's cross-examination of his wife regarding whether she was afraid of him. 31 Kan. App. 2d at 290-91. The court held the examination was proper because it would

demonstrate whether she had any bias. But it took issue with the State's failure to admit extrinsic evidence that she was afraid of Ward once she denied it, stating:

"[W]e are troubled by the State's failure to complete the impeachment. Once Sheila denied the specific instances of physical abuse, the State should have offered extrinsic evidence to illustrate that Sheila's denial of the specific instances of abuse was suspect." 31 Kan. App. 2d at 292 (citing Barbara, Kansas Rules of Evidence with Evidence Objections and Evidentiary Foundations § 3.1 [4th ed. 1997]).

The most recent edition of Barbara, Kansas Law and Practice continues to support the rule that counsel admit extrinsic evidence, either by producing the document or live witness testimony, if the witness denies the impeaching fact. It explains that the purpose of this rule "is to insure against unfair cross-examination where the examiner may misquote or take the statement out of context." Barbara, Kansas Law and Practice, § 3:1 (5th ed. 2001). These procedures were not followed, preventing the jury from determining whether Ontiberos and Dr. Barnett's testimony was suspect. And our review of the record establishes at least one instance when the State was misstating the alleged facts—not Ontiberos. We hold that counsel's performance fell below an objective standard of reasonableness.

We find it disturbing that the State's method of cross-examination pervaded the trial without intervention by Ontiberos' advocate. No evidence was admitted for the jury's review to determine the accuracy of the facts alleged to underlie the State's questions, and this was particularly egregious since some of the State's questions were not supported by the record. This again suggests Ontiberos' trial counsel lacked sufficient familiarity with the evidence in his case and the rules governing admissibility of evidence. And while the substance of the parties' stipulation is not entirely clear, we can tell without further detail that it was ineffective assistance of counsel for Ontiberos' attorney to enter into a stipulation that avoided the need to admit evidence that would allow the jury to make these essential determinations.

*Failure to Object to State's Question about a Knife*

As discussed above, the State asked Dr. Barnett whether Ontiberos had disclosed that he was disciplined in 2003 for having a knife. Dr. Barnett admitted that Ontiberos had not disclosed it, simultaneously impeaching Dr. Barnett's evaluation of Ontiberos and suggesting Ontiberos was dishonest. Ontiberos' attorney did not object to the question, and the State did not admit the alleged discipline record into evidence.

This is the most poignant example of why attorneys must produce extrinsic evidence to avoid misquoting or mischaracterizing a document. Ontiberos' attorney remained silent while the State questioned Dr. Barnett without producing the discipline report for his verification that the described incident occurred. Presumably Ontiberos' attorney was unaware that the evidence had been mischaracterized; and based on the stipulation Ontiberos' attorney entered, the State did not submit the document to the jury either. Ontiberos' attorney's failure to familiarize himself with the evidence and to object when this question was posed to Dr. Barnett falls below an objective standard of reasonableness.

*Were These Errors Prejudicial?*

Having found that error occurred, we must determine whether there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *Bledsoe,* 283 Kan. at 90-91. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Harris v. State,* 288 Kan. 414, Syl. ¶ 3, 204 P.3d 557 (2009).

To summarize, we have concluded above that counsel's performance fell below an objective standard of reasonableness because he: (1) failed to introduce evidence that a 2006 Static-99 concluded that Ontiberos was a lower risk to reoffend; (2) entered a stipulation allowing Dr. McCoy to review evidence that was arguably inadmissible without first familiarizing himself with K.S.A. 60-456's evidentiary requirements and this court's *Gonzalez* decision; (3) failed to object when the State impeached Ontiberos and his expert witness without introducing extrinsic evidence to complete the im-

peachment; and (4) failed to object to the State's mischaracterization of a corrections department-discipline report.

Two themes pervade these errors. The first is counsel's failure to familiarize himself with the evidence. This is evident by not introducing the more favorable Static-99 test results, failing to inform his expert witness that Ontiberos had taken a penile plethysmograph, and not objecting when the State mischaracterized the discipline report as involving a knife. The second theme is a failure to recognize the evidentiary rules governing expert testimony and cross-examination.

While each individual error may not have required reversal, the accumulation of these errors undermines our confidence in the trial's outcome. These circumstances precluded the jury from hearing the only evidence corroborating Ontiberos' expert's testimony. Here the jury was only informed about one Static-99 test result—the one placing him at high risk to re-offend. And Dr. Barnett's testimony criticizing the reliability of the tests Dr. McCoy used would have been more credible if the jury was provided an example of the inconsistency. Moreover, counsel's failure to object allowed the State to impeach both Ontiberos and his expert without establishing a basis for the impeachment. Given the pervasive nature of counsel's errors, we conclude there is a reasonable probability that the outcome would have been different.

*Opposing Counsel's Misconduct*

Finally, Ontiberos argues he is entitled to a new trial because the State's attorney committed misconduct. And although we would ordinarily not address Ontiberos' other claimed errors because we are reversing his civil commitment on other grounds, we briefly consider his claim that the state's attorney committed misconduct by attempting to impeach Ontiberos and Dr. Barnett without admitting evidence to complete the impeachment. We do so because it may arise again on remand. See *State v. Hernandez*, 294 Kan. 200, 209, 273 P.3d 774 (2012).

Just as it was ineffective assistance of counsel for Ontiberos' attorney to allow the State to cross-examine Ontiberos and Dr. Barnett without admitting into evidence the documents the State re-

lied on for impeachment, the State committed error by cross-examining the witnesses in this fashion. By failing to identify and admit into evidence the documents the State relied upon, the State prevented the jury from deciding the facts and properly assessing credibility. It also allowed the State to mischaracterize the KDOC discipline report and insinuate Ontiberos was disciplined while imprisoned for having an unauthorized weapon without support in the record. This is misconduct under any standard. If the State initiates another civil commitment proceeding against Ontiberos, the State must admit extrinsic evidence to complete the impeachment if a trial witness denies making a prior inconsistent statement or the witness claims that he or she cannot remember the events that form the factual premise for the question.

The judgment of the Court of Appeals reversing and remanding this case to the district court is affirmed. The judgment of the district court is reversed and remanded.

MORITZ, J., not participating.
THOMAS H. SACHSE, District Judge, assigned.