No. 113,503

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

IN THE MATTER OF THE CARE AND TREATMENT OF CECIL W. EMERSON,

SYLLABUS BY THE COURT

1.

When appointed counsel for a person determined to be a sexually violent predator files a timely notice of appeal but fails to file a brief, resulting in dismissal of the appeal, the *Flores-Ortega* standard determines our jurisdiction.

2.

Arguments of waiver or laches which the district court considered and resolved against the State but which the State failed to cross-appeal, are not properly preserved on appeal.

3.

We apply retroactively the amendments to the Sexually Violent Predator Act (SVPA), which state that the Act's time limits, including a 60-day time limit for conducting trial after the probable cause hearing, do not affect the trial court's subject matter jurisdiction.

4.

A jury instruction error which relieves the State of its burden to prove an element is harmless, meaning it had no impact on the trial's outcome, when counsel expressly concedes that element is met before the case is submitted to the jury.

1

5.

A party claiming the court erred in admitting an expert report has the burden of designating a record that affirmatively shows prejudicial error. Without such a record, we presume the action of the district court was proper.

Appeal from Sedgwick District Court; GREGORY L. WALLER and PAUL CLARK, judge. Opinion filed February 12, 2016. Affirmed.

*Michael P. Whalen*, of Law Office of Michael P. Whalen, of Wichita, for appellant.

*Natalie Chalmers*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellee.

Before ATCHESON, P.J., GARDNER, J., and BURGESS, S.J.

GARDNER, J.:  On October 24, 2000, a jury determined Cecil Emerson was a sexually violent predator. His appointed counsel filed a timely notice of appeal but failed to file a brief, thus Emerson's appeal was dismissed. Nearly 12 years later, the district court granted Emerson's motion to file a direct appeal out of time. This case asks whether we have the power to hear Emerson's untimely appeal and, if so, whether the jury's verdict finding him to be a sexually violent predator should be upheld. We answer both questions in the affirmative.

*Procedural background*

*Emerson's trial*

In August of 1999, the State filed a petition seeking to commit Cecil Emerson for care and treatment as a sexually violent predator. At Emerson's jury trial, the parties stipulated Emerson had the following prior convictions:  (1) lascivious acts with a child in 1975; (2) indecent liberties with a child in 1981; and (3) sexual exploitation of a child

2

in 1990. The 1975 and the 1981 convictions involved sexual contact with two 9-year-old girls, and the 1990 conviction involved sexual contact with a 15-year-old girl.

The State presented two witnesses: Rex Rosenberg, a master's level psychologist, and Dr. Jose Bulatao, a psychiatrist. Both practiced at Larned State Security Hospital. Emerson's sole witness was Dr. William Searle Logan, a psychiatrist. After hearing the testimony, the jury found that the State had proved beyond a reasonable doubt that Emerson was a sexually violent predator.

*Posttrial proceedings*

Emerson's appointed trial counsel, Michael Lehr, was also appointed to handle Emerson's appeal. Although Lehr timely filed a notice of appeal, he failed to file any brief. Accordingly, on August 21, 2002, this court dismissed Emerson's appeal. In 2006, Lehr voluntarily surrendered his license and was disbarred from the practice of law in Kansas. *In re Lehr*, 281 Kan. 842, 133 P.3d 1279 (2006).

In July 2014, Emerson filed a motion to allow an appeal out of time. The district court heard arguments regarding the *Ortiz* exceptions, which permit a defendant to file an out-of-time appeal. See *State v. Ortiz*, 230 Kan. 733, Syl. ¶ 3, 640 P.2d 1255 (1982). The district court expressed concerns over the lapse in time and wanted "to find out whether or not Mr. Emerson was aware of his appeal and whether or not Mr. Emerson just sat back and decided to do nothing." Emerson testified that around 2003 or 2004, Lehr informed him the court was not paying for his services so he was no longer assisting Emerson with his appeal. Emerson also testified he learned in 2006 that Lehr had been disbarred. Although his testimony regarding the time frame is not clear, Emerson said when he was informed he did not have counsel he "went into a state of kind of depression" and did not believe he would ever be released. He also explained he did not want to use a jailhouse lawyer because he did not want "the Court mad at [him]." After

3

hearing the testimony, the district court determined the third *Ortiz* exception applied because Emerson's appointed attorney had failed to perfect and complete his appeal, so it granted Emerson's motion to file his appeal out of time.

I. *Do we have jurisdiction to consider Emerson's untimely appeal*?

We first examine whether we have jurisdiction to consider Emerson's untimely appeal.

The right to appeal is statutory and is not found in the United States or Kansas Constitutions. *State v. Legero*, 278 Kan. 109, 111, 91 P.3d 1216 (2004). Subject to certain exceptions, Kansas appellate courts have jurisdiction to entertain an appeal only if the appeal is taken within the time limitations and in the manner prescribed by the applicable statutes. *State v. Mburu,* 51 Kan. App. 2d 266, 269-70, 346 P.3d 1086, *rev. denied* 302 Kan. ____ (June 29, 2015). Emerson's appeal is brought long after the statutory time limit.

The district court relied on *Ortiz*, which creates equitable exceptions to the general rule that this court must dismiss an untimely notice of appeal for lack of jurisdiction. *Ortiz*'s limited exceptions allow a defendant to file an out-of-time appeal when the defendant: (1) was not informed of his or her right to appeal; (2) was not furnished an attorney to exercise that right; or (3) was furnished an attorney who failed to perfect and complete an appeal. 230 Kan. at 736. These three have been characterized as "'narrow exceptional circumstances.'" *State v. Patton*, 287 Kan. 200, 206, 195 P.3d 753 (2008). The State neither appealed nor cross-appealed the district court's ruling that the third *Ortiz* exception applied. Therefore, neither party actually challenges the district court's finding regarding *Ortiz*.

Nonetheless, this court has a duty to question jurisdiction on its own initiative. Subject matter jurisdiction may be raised at any time, even on appeal and even on the

4

appellate court's own motion. *Shipe v. Public Wholesale Water Supply Dist. No. 25*, 289 Kan. 160, 166, 210 P.3d 105 (2009).

> *The source of the right to take an untimely appeal in a SVP commitment proceeding.*

We first examine the source of the right to take an untimely appeal in a SVP commitment proceeding. Although the district court relied on *Ortiz* exceptions, those exceptions were originally developed to permit a criminal defendant a direct appeal from a conviction and sentence, in an otherwise untimely appeal. *Ortiz*, 230 Kan. at 735-36; *Albright v. State*, 292 Kan. 193, 198, 251 P.3d 52 (2011). Ours is not a criminal case.

Our research fails to reveal any published case applying the *Ortiz* exceptions in a civil commitment context. In a 2004 case appealing the denial of a K.S.A. 60-1507 motion, which is a civil proceeding, the Kansas Supreme Court cited *Ortiz* as analogous, but based its holding on a principle of fundamental fairness, finding that when counsel is appointed by the court in postconviction matters and fails to notify the client of the right to appeal, the appeal must be allowed. *Brown v. State*, 278 Kan. 481, 101 P.3d 1201 (2004). See Supreme Court Rule 183(a) (2014 Kan. Ct. R. Annot. 285).

In *Albright*, the Kansas Supreme Court disagreed that the third *Ortiz* exception allows an appellate court to accept jurisdiction when a 60-1507 movant's appointed counsel failed to file an appeal. In *Albright*, the appellant successfully argued that where appointed counsel's performance was deficient in an underlying criminal case for having failed to file a timely direct appeal, the 60-1507 movant should be allowed to file an out-of-time direct appeal. The Kansas Supreme Court first found that the source of the right to counsel is not dispositive, stating:

5

"Further, as analyzed in *Patton* and *Kargus,* regardless of whether [the right to counsel] is based on the constitution, statute, or both, if it is alleged that appointed counsel's deficiencies resulted in the loss of the ability to pursue a procedure, the *Flores-Ortega* standard is to be applied." *Albright*, 292 Kan. at 211.

The court emphasized the distinction between counsel's deficiencies during the course of a proceeding and deficiencies which result in forfeiture of a proceeding:

"[*Flores-Ortega*] distinguishes between situations in which counsel's performance in the course of a proceeding is alleged to be deficient and those cases in which counsel's performance or failure to perform leads to forfeiture of a proceeding. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), governs the former and *Flores-Ortega* the latter. See *Flores-Ortega,* 528 U.S. at 476-86, 120 S. Ct. 1029." *Patton*, 287 Kan. at 224.

But the court clarified that in the latter situation, it is not the third *Ortiz* exception that allows us to accept jurisdiction.

"60-1507 movants who have counsel are entitled to the effective assistance of that counsel, and if counsel's performance was deficient for failure to file a timely appeal, as a remedy a 60-1507 movant should be allowed to file an out-of-time appeal. We do not agree, however, that it is the third *Ortiz* exception that allows an appellate court to accept jurisdiction." *Albright,* 292 Kan. at 207.

Instead, the court concluded that the analysis of *Roe v. Flores-Ortega,* 528 U.S. 470, 120 S. Ct. 1029, 145 L. Ed. 2d 985 (2000) should apply. The Kansas Supreme Court concluded the Court of Appeals should not have dismissed Albright's appeal. Because appointed counsel's deficiencies resulted in the loss of his ability to pursue an appeal, the appropriate remedy was to exercise jurisdiction over Albright's appeal. *Albright,* 292 Kan. at 211-12. Similarly, in *Kargus v. State*, 284 Kan. 908, 928, 169 P.3d 307 (2007), the Kansas Supreme Court found relief may be appropriate under *Flores-Ortega* rather

6

than under *Ortiz* or *Strickland* when appointed counsel fails to file a petition for review following a direct appeal in a criminal case.

After *Albright*, the Kansas Supreme Court decided *In re Care & Treatment of Ontiberos*, 295 Kan. 10, 25, 287 P.3d 855 (2012), holding that persons subject to SVPA proceedings have a due process right to the appointment of counsel at trial. That right carries with it a correlative right to competent, effective counsel. *Ontiberos*, 295 Kan. at 25; *Albright,* 292 Kan. at 207. The court disapproved, however, the Court of Appeals' reliance on an analogy to 60-1507 cases in SVPA actions, finding in part that because SVPA proceedings are original actions and 60-1507 proceedings are collateral proceedings, the latter are "inappropriate analogs." 295 Kan. at 22. This is sufficient to give us brief pause in applying *Albright,* a 60-1507 case, to this SVPA proceeding, but we believe *Albright* remains analogous because it examined a person's right to a direct appeal, not to a collateral proceeding. We do the same. And despite its recognition that SVPA proceedings, although civil in nature, possess many characteristics of a criminal proceeding, *Ontiberos* did nothing to disapprove *Albright's* holding that *Ortiz* provided no basis for its appellate jurisdiction. And the court's recognition of the similarities between SVPA proceedings and criminal proceedings predated both *Ontiberos* and *Albright*. See *In re Care & Treatment of Foster*, 280 Kan. 845, 127 P.3d 277 (2006). Accordingly, we do not read *Ontiberos* to suggest that *Albright* is no longer good law or that *Ortiz* should be applied in this SVP case.

But regardless of whether the source of Emerson's legal right to take an untimely appeal in this case arises by analogy to *Ortiz* or to *Albright*, we are convinced Emerson has such a right, based on fundamental fairness as recognized in the cases cited above.

*The Flores-Ortega standard of performance applies.*

Those cases make clear that *Flores-Ortega* provides the substantive test Emerson must meet to be able to invoke his right to a late direct appeal. Regardless of whether Emerson's right to a late appeal is based on *Albright* or *Ortiz,* "if it is alleged that appointed counsel's deficiencies resulted in the loss of the ability to pursue a procedure, the *Flores–Ortega* standard is to be applied." *Albright*, 292 Kan. at 211. See *Patton*, 287 Kan. at 224 ("[W]e hold that the standard of performance to be applied to measure the adequacy of appellate counsel under the third *Ortiz* exception is that found in *Roe v. Flores–Ortega.*")

In contrast to *Strickland's* prejudice requirement, which requires the movant to show a reasonable probability that the outcome of the proceeding would have been different but for counsel's deficient performance, *Flores-Ortega* presumes prejudice from the forfeiture of a proceeding.

> "Under *Flores-Ortega,* if appointed or retained counsel has failed to file or perfect a direct appeal by a criminal defendant, we will presume the existence of prejudice. This is not, however, the same as a finding of prejudice per se, requiring application of the third *Ortiz* exception. The defendant must still demonstrate that, but for counsel's failure, he or she would have taken a timely direct appeal. The defendant need not show, as he or she would have had to show if we were using the *Strickland* standard as our benchmark, that such a timely direct appeal would have been successful." *Patton,* 287 Kan. at 225.

Emerson had appointed counsel at trial and on appeal in this SVP case, so he had the right to competent, effective assistance of counsel. See *Ontiberos*, 295 Kan. at 25. Emerson has met his burden to demonstrate that but for counsel's failure, he would have taken a timely direct appeal, since his appointed counsel filed both a timely notice of appeal and a docketing statement in his initial appeal. See *Albright*, 292 Kan. at 206;

8

*King v. State*, 37 Kan. App. 2d 449, 452-53, 154 P.3d 545 (2007). We thus presume prejudice. Here, as in *Albright*, no presumption of reliability can be afforded a proceeding that never took place.

> *The remedy of permitting the untimely appeal is appropriate here.*

Lastly, we determine whether the remedy of permitting the filing of an untimely appeal is appropriate where Emerson's counsel filed a timely notice of appeal and a docketing statement, but he filed no brief on appeal. Under the *Flores-Ortega* standard, "[i]f the movant requested that an appeal be filed and it was either not filed at all or was not timely filed, appointed counsel was ineffective and the untimely appeal should be allowed." *Albright*, 292 Kan. at 211. Here, however, an appeal was timely filed.

We have not found any case applying the third *Ortiz* exception to an attorney's failure to file a brief following a timely notice of appeal. Instead, our court has stated that the third *Ortiz* exception would *not* apply if an attorney filed a timely notice of appeal but failed to file a brief. *City of Wichita v. Tucker*, No. 110,076, 2014 WL 2590085, at *4 (Kan. App. 2014) (unpublished opinion) *rev. granted* 301 Kan. ___ (April 29, 2015). But that statement was a passing comment unnecessary to the decision in the case, so is dicta.

We have, however, previously applied the *Flores-Ortega* standard to a 60-1507 case in which an attorney failed to file a brief, resulting in a dismissal of the appeal. In *King*, 37 Kan. App. 2d 449, King had timely appealed from the district court's denial of his K.S.A. 60-1507 motion, but his appellate counsel had not timely filed a brief. We found it apparent King wanted to appeal his sentence because a notice of appeal and docketing statement had been filed. We concluded that due to appellate counsel's performance, King had been denied his right to a direct appeal. Following *Flores-Ortega*, we presumed prejudice and permitted King to file his direct appeal out of time. 37 Kan. App. 2d at 450-53. We note that the Kansas Supreme Court has taken the same approach

9

in an SVP case, although an unpublished one. See *Noble v. Sullivan*, No. 112,101, 2015 WL 5010067 (Kan. App. 2015) (unpublished opinion), *rev. denied 302* Kan. ___ (December 14, 2015).

Based on the foregoing authorities, we find that Emerson's untimely direct appeal should be heard. Emerson's appointed appellate counsel filed a timely notice of appeal but filed no brief, resulting in dismissal of Emerson's appeal. That deficiency resulted in the loss of Emerson's ability to pursue a procedure, rather than a mere deficiency in his attorney's performance which could perhaps be remedied via a 60-1507 motion. Due to counsel's failure, Emerson's direct appeal was forfeited. The appropriate remedy for that failure is to permit the untimely appeal. Accordingly, we have jurisdiction over Emerson's appeal.

### *The State has failed to preserve other issues.*

We note the State's contention that Emerson waived his right to appeal by signing certain paperwork in prison and by waiting for years after he learned his attorney was disbarred before filing the present motion. But these are arguments which the State raised to the district court in its objection to Emerson's motion to appeal out of time and which the district court considered and rejected. The State failed to cross-appeal either of those issues, so they are not properly preserved on appeal. See *Cooke v. Gillespie*, 285 Kan. 748, Syl. ¶ 2, 176 P.3d 144 (2008) ("Before an appellee may present adverse rulings to the appellate court it must file a cross-appeal. If the appellee does not, the rulings are not properly before the appellate court and may not be considered.").

II. *Did the district court lose jurisdiction over Emerson's trial?*

Emerson next contends the district court lost jurisdiction of his SVP case when his trial was not held within 60 days of his probable cause hearing. Although Emerson fails

to provide the date he believes the 60 days began to run, the petition was filed on August 26, 1999, Emerson waived his probable cause hearing on September 23, 1999, and his trial was not until October 23-25, 2000. The State does not contend that Emerson was timely brought to trial. Instead, it contends that failure to comply with the applicable time limits does not defeat jurisdiction.

To decide this issue, we must interpret K.S.A. 59-29a01 *et seq*. Interpretation of a statute is a question of law over which appellate courts have unlimited review. *Neighbor v. Westar Energy, Inc.*, 301 Kan. 916, 918, 349 P.3d 469 (2015). The most fundamental rule of statutory construction is that the intent of the legislature governs if that intent can be ascertained. We first attempt to ascertain legislative intent through the statutory language enacted, giving common words their ordinary meanings. When a statute is plain and unambiguous, an appellate court should not speculate about the legislative intent behind that clear language, and it should refrain from reading something into the statute that is not readily found in its words. *Cady v. Schroll*, 298 Kan. 731, 738-39, 317 P.3d 90 (2014).

At the time Emerson's initial direct appeal was pending, K.S.A. 2000 Supp. 59-29a06(a) provided:  "Within 60 days after the completion of any hearing held pursuant to K.S.A. 59-29a05 and amendments thereto, the court shall conduct a trial to determine whether the person is a sexually violent predator." The Kansas Supreme Court interpreted this statute to mean the 60-day time limit was mandatory and jurisdictional. See *In re Care & Treatment of Searcy*, 274 Kan. 130, Syl. ¶¶ 4-5, 49 P.3d 1 (2002). Emerson urges us to apply that same interpretation now.

But in 2003, the legislature amended the statutes to expressly provide that the time limits in the SVPA were not intended to be mandatory or to otherwise affect the district courts' subject matter jurisdiction. Effective July 1, 2014, K.S.A. 2014 Supp. 59-29a06(a) provided:  "Within 60 days after the completion of any hearing held pursuant to K.S.A.

11

59-29a05, and amendments thereto, the court shall conduct a trial to determine whether the person is a sexually violent predator." Effective July 1, 2014, K.S.A. 2014 Supp. 59-29a06(f) provided: "The provisions of this section are not jurisdictional, and failure to comply with such provisions in no way prevents the attorney general from proceeding against a person otherwise subject to the provision of K.S.A. 59-29a01 *et seq*., and amendments thereto." The legislature thus expressed its clear intent that the time limits were not intended to be jurisdictional.

Based on that intent, our court held that the 60-day time limit was not mandatory, and failure to comply with it does not divest the court of jurisdiction.

> "Because the 60-day time limit of K.S.A. 2002 Supp. 59-29a06 is directory and not mandatory, the failure to bring a candidate for sexually violent predator status to trial within 60 days of the determination of probable cause does not divest the district court of subject matter jurisdiction." *In re Care & Treatment of Hunt*, 32 Kan. App. 2d 344, 345, 82 P.3d 861, *rev. denied* 278 Kan. 845 (2004).

Which of these statutes applies here? The Kansas Supreme Court has not reached the issue of which law applies when a late appeal is granted under *Flores-Ortega.* It has held, however, that when a late appeal is granted by the district court under *Ortiz*, the appeal is subject to the law in effect at the time the district court granted the late appeal rather than the law in effect when the defendant should have filed his or her direct appeal and during its pendency. *State v. Thomas*, 283 Kan. 796, 805, 156 P.3d 1261 (2007); *State v. Harp*, 283 Kan. 740, 748, 156 P.3d 1268 (2007). Here, a late appeal was granted by the district court under *Ortiz.* Although we base our jurisdiction on *Flores-Ortega,* we see no reason to apply a different rule regarding which law to apply. Accordingly, we apply the law in effect when Emerson's late appeal was granted by the district court in July 2014. That law clearly stated that the 60-day provision was "not jurisdictional." K.S.A. 2014 Supp. 59-29a06(f). Thus the district court was not divested of jurisdiction when it failed to meet the 60-day provision provided in K.S.A. 59-29a06.

12

We note that effective July 1, 2015, various amendments to 59-29a06 were made, including removal of the phrase: "The provisions of this section are not jurisdictional." Those amendments are not relevant here. Further, the legislative intent since 2003 remains clear that the time requirements in the SVPA are intended to be directory and not mandatory. As K.S.A. 2015 Supp. 59-29a01(b) currently provides, and has provided since 2003:

> "Notwithstanding any other evidence of legislative intent, it is hereby declared that any time requirements set forth in K.S.A. 59-29a01 *et seq*., and amendments thereto, either as originally enacted or as amended, are intended to be directory and not mandatory and serve as guidelines for conducting proceedings under K.S.A. 59-29a01 *et seq*., and amendments thereto."

Accordingly, we find that any failure to comply with the statutory 60-day provision did not divest the district court of its jurisdiction.

III. *Did the district court err by giving an improper jury instruction?*

Emerson next argues that the definitions in jury instruction No. 6 were improper because they relieved the State of its burden of proof on an element. Specifically, Emerson contends the district court relieved the State of its burden to prove that pedophilia and exhibitionism were mental abnormalities by informing the jury as a matter of law that pedophilia and exhibitionism were mental abnormalities. Emerson claims this error denied him his due process right to a fair trial.

We first set forth our standard of review when addressing challenges to jury instructions:

> "'(1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2)

13

next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012).'" *State v. Woods*, 301 Kan. 852, 876, 348 P.3d 583 (2015).

Emerson agrees that he did not object on this basis to the instruction, and both parties agree, as do we, that our standard of review is thus whether the instruction was clearly erroneous. K.S.A. 22-3414(3). Giving an instruction is clearly erroneous only if we reach a firm conviction that had the trial error not occurred, there is a real possibility the jury would have returned a different verdict. *State v. Williams*, 295 Kan. 506, Syl. ¶¶ 4-5, 286 P.3d 195 (2012).

The jury was instructed that to find Emerson was a sexually violent predator, they had to find, among other elements, the State had proved beyond a reasonable doubt "that [Emerson] suffers from a mental abnormality or personality disorder."

Jury instruction No. 6 provided:

"'Mental abnormality' means a congenital or acquired condition affecting the emotional or volitional capacity which predisposes the person to commit sexually violent offenses in a degree constituting such person a menace to the health and safety of others. Generally recognized mental abnormalities include:

"Pedophilia
"Exhibitionism

"'Volitional Capacity' is the capacity to exercise choice or will. In this case it would be a condition that renders the person unable to control his behavior.

14

"'Personality Disorder' is defined as an enduring pattern of inner experience and behavior that deviates markedly from the expectations of the individual's culture, is pervasive and inflexible, has an on set in adolescence or early adulthood, is stable overtime, and leads to distress or impairment. Generally recognized personality disorders include:

"Borderline Personality Disorder

"'Likely to engage in repeat acts of sexual violence' means a person's propensity to commit acts of sexual violence is of such a degree as to pose a menace to the health and safety of others.

"'Sexually motivated' means that one of the purposes for which the defendant committed the crime was for the purpose of the defendant's sexual gratification."

But Emerson's counsel conceded during his closing argument to the jury that Emerson had a mental abnormality, stating:

"We're not contesting that he does have a mental abnormality. He does, but with the treatment he's already received, with his relapse prevention plan, he is in a position where the likelihood of him reoffending is so low, of 20 percent, that it doesn't constitute a menace to the safety and health of others."

We first address the effect of this concession. We recognize that sometimes a trial attorney may find it advantageous to his client's interests to concede certain elements of an offense or a claim and that making such a concession may be an acceptable tactical decision. Such is the case here. By his concession, Emerson's counsel, with full awareness of the effect of his words, intentionally removed the burden the State otherwise would have had of proving that Emerson had a mental abnormality. He thus waived any objection that the jury instruction was clearly erroneous. See *State v. Daniels,* 2 Kan. App. 2d 603, 607, 586 P.2d 50 (1978) (A waiver is an intentional relinquishment of a known right, made with full awareness of the effect.)

15

Alternatively, the claim of clear error is defeated by the invited error doctrine. "Under the invited error doctrine, an appellate court will not consider claims of error prompted or invited by the appellants before the district court." *State v. Acevedo,* 49 Kan. App. 2d 655, 668-69, 315 P.3d 261 (2013), *rev. denied* 300 Kan. 1104 (2014). Emerson's counsel invited the jury to conclude that the State had met its burden of proof with respect to the second element – that Emerson had a "mental abnormality." Having done so, he cannot now claim error in the jury instruction's treatment of that burden. Accordingly, Emerson's argument fails under the invited error doctrine. See *State v. Hatfield*, No. 111,622, 2015 WL 5036736, at *1 (Kan. App. 2015) (applying invited error doctrine where attorney suggested restitution at an amount not supported by the evidence). The existence of invited error ends this court's inquiry "even if relief necessarily would have been afforded for the error had the complaining party not caused it." *State v. Schreiner,* 46 Kan. App. 2d 778, 790-91, 264 P.3d 1033 (2011), *rev. denied* 296 Kan. 1135 (2013).

But even if we were to review jury instruction No. 6 for clear error, and if we found it effectively relieved the State, as a matter of law, from having to prove that Emerson had a mental abnormality or personality disorder, we would find no clear error. The omission of an essential element of an offense from the jury instructions in a criminal case is subject to the harmless error test. *State v. Daniels,* 278 Kan. 53, 62, 91 P.3d 1147, *cert. denied* 543 U.S. 982 (2004). That same rule should apply here.

In making the determination of harmlessness, we are guided by *State v. Ward*, 292 Kan. 541, 565, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012):

> "[B]efore a Kansas court can declare an error harmless it must determine the error did not affect a party's substantial rights, meaning it will not or did not affect the trial's outcome. The degree of certainty by which the court must be persuaded that the error did not affect the outcome of the trial will vary depending on whether the error implicates a right

16

guaranteed by the United States Constitution. If it does, a Kansas court must be persuaded beyond a reasonable doubt that there was no impact on the trial's outcome, *i.e.*, there is no reasonable possibility that the error contributed to the verdict. If a right guaranteed by the United States Constitution is not implicated, a Kansas court must be persuaded that there is no reasonable probability that the error will or did affect the outcome of the trial."

Applying this test, we find any jury instruction error in Emerson's case to be harmless. Although juries are routinely instructed, as they were here, that "counsel's remarks, statements and arguments . . . are not evidence," and that they should disregard any remark that is "not supported by the evidence or the law as given to you by the court," a reasonable jury would take the kind of concession made by Emerson's counsel during closing argument at face value, rather than dismiss it as empty bluster. Our courts do the same. See e.g., *Edgar v. State*, 294 Kan. 828, 834, 283 P.3d 152 (2012) (examining whether counsel was ineffective for having made concessions during closing argument which arguably relieved the State of its burden of proof on two counts). Any reasonable jury would rely on counsel's admission that Emerson had a mental abnormality, rather than work through a jury instruction in an attempt to figure out how to make that determination and then make it. Any failure of the jury instruction in relieving the State of its burden to prove Emerson had a mental abnormality thus *did not cause* this jury to find that Emerson had a mental abnormality. Instead, counsel's concession that Emerson had a mental abnormality led them to so find. We thus are not convinced of a real possibility that the jury would have returned a different verdict had the alleged error not occurred. On the contrary, we are persuaded beyond a reasonable doubt that the definitions in the jury instruction had no impact on the trial's outcome.

Nor do we find any merit to Emerson's underlying assertion that the State failed to prove that his pedophilia and exhibitionism were mental abnormalities. Even if we were to ignore the concession by Emerson's counsel, the record includes sufficient evidence on this issue for the jury to have found for the State. Neither Emerson's expert nor his

17

attorney argued Emerson did *not* have a mental abnormality, and Rosenberg and Dr. Bulatao both expressly based their diagnoses of pedophilia and exhibitionism on the DSM-IV, the Diagnostic and Statistical Manual of Mental Disorders (Fourth Edition), which specifically includes those mental disorders. Further, during cross-examination, Rosenberg testified, "I found enough evidence to indicate [Emerson] has a mental abnormality, and the diagnosis or diagnoses that were applied were pedophilia and exhibitionism."

Further, Dr. Logan, Emerson's own expert, impliedly confirmed that conclusion. When asked if Emerson had a mental abnormality, he replied that the definition of that term was "so broad that it really includes almost anything that would be within the diagnostic manual in psychiatry," *i.e.*, the DSM-IV. The experts' uncontradicted testimony thus provides a solid basis for the jury's finding that the diagnoses of pedophilia and exhibitionism, which were based on the DSM-IV, were diagnoses of mental abnormalities.

Additionally, abundant evidence supports the jury's determination. As we more thoroughly discuss below, three expert witnesses testified as to the reports they reviewed, to the interviews they conducted, and to their ultimate findings. Two found that Emerson was likely to reoffend. After weighing the evidence, the jury determined Emerson was a sexually violent predator. Sufficient evidence supports that decision, and we find no real possibility the jury would have returned a different verdict had the jury instruction not included the challenged language.

IV. *Did the court err in admitting expert reports?*

Emerson next argues the district court erred by admitting Rosenberg and Dr. Bulatao's expert report. Emerson contemporaneously objected to the admission of the

18

report at the hearing. See K.S.A. 60-404; *In re Thomas*, 301 Kan. at 845. He claims the report should have been excluded because it was hearsay.

We do not reach that issue, however, because Emerson has failed to include the challenged report in the record on appeal. Without the report, we cannot determine what the report states or how its contents may have influenced the jury, as is necessary to establish prejudicial error. Emerson bears the burden of establishing an adequate record. A "party claiming an error occurred has the burden of designating a record that affirmatively shows prejudicial error." *In re Thomas*, 301 Kan. at 845 (citing *State v. McCullough*, 293 Kan. 970, 999, 270 P.3d 1142 [2012]). Without such a record, an appellate court presumes the action of the district court was proper. *State v. Bridges*, 297 Kan. 989, 1001, 306 P.3d 244 (2013). We do so here.

V. *Does sufficient evidence support the verdict?*

Emerson argues the State failed to present sufficient evidence as to two elements. First, Emerson claims the State failed to prove the diagnoses addressed in the previous issue were mental abnormalities. We have resolved that issue above. Second, Emerson contends the State failed to prove Emerson was likely to commit repeat acts of sexual violence due to a mental abnormality or personality disorder.

We first set forth our standard of review.

> "When presented with an issue of whether evidence was sufficient to sustain the State's burden of proof in a sexually violent predator case, this court's standard of review asks whether, after review of all the evidence, viewed in the light most favorable to the State, we are convinced a reasonable factfinder could have found the State met its burden to demonstrate beyond a reasonable doubt that the individual in question is a sexually violent predator. See *In re Care & Treatment of Colt,* 289 Kan. 234, 243–44, 211 P.3d 797 (2009); *In re Care & Treatment of Hay,* 263 Kan. 822, 842, 953 P.2d 666 (1998); see

also K.S.A. 2010 Supp. 59-29a07(a) (stating reasonable doubt burden). As an appellate court, we will not reweigh the evidence, pass on the credibility of witnesses, or resolve conflicts in the evidence. *State v. Hayden,* 281 Kan. 112, 132, 130 P.3d 24 (2006); *In re Care & Treatment of Ward,* 35 Kan.App.2d 356, 371, 131 P.3d 540, *rev. denied* 282 Kan. 789 (2006)." *In re Care & Treatment of Williams*, 292 Kan. 96, 104, 253 P.3d 327 (2011).

Accordingly, we review the evidence in the case.

Rosenberg testified he had completed 38 sexual predator evaluations at the time of the trial. Of those 38, 25 met the statutory criteria to be classified as sexually violent predators, 10 did not, and he could not make a determination either way as to the remaining 3 patients. He further explained a master file was prepared on each individual admitted to the state hospital. That file included information on progress, treatment plans, and mental and physical health. When reviewing the master file, Rosenberg paid the most attention to the reports from other facilities.

Rosenberg also conducted personal interviews. He interviewed Emerson three times for a total of approximately 7.25 hours, and they discussed Emerson's sexual history. Rosenberg testified about Emerson's prior treatment, saying, "One thing that sticks out in my mind that in terms of the evaluation troubled me was his continued reference to these girls as young ladies or young women. That would suggest that there's still some conflict of distortion even after treatment."

To diagnose Emerson, Rosenberg relied on the Fourth Edition of the Diagnostic and Statistical Manual of Mental Disorders. Based on the criteria listed in the DSM-IV, Rosenberg diagnosed Emerson with pedophilia and exhibitionism. During cross-examination, Rosenberg said, "I found enough evidence to indicate [Emerson] has a mental abnormality, and the diagnosis or diagnoses that were applied were pedophilia and exhibitionism." Rosenberg believed Emerson was likely to commit further predatory

20

acts of sexual violence if released and Emerson was a menace to the health and safety of others.

Dr. Bulatao testified he relied on other professionals' test results and evaluations when forming his own opinions. In Emerson's case, he reviewed the Report of Clinical Evaluation from the Kansas Department of Corrections and the Clinical Services Report from the Kansas Parole Board. Additionally, Dr. Bulatao reviewed Rosenberg's draft report, as it was his responsibility to agree or disagree with the report and to make necessary corrections. Dr. Bulatao read and signed the report.

Dr. Bulatao interviewed Emerson for roughly 1.25 hours. Dr. Bulatao diagnosed Emerson with pedophilia attracted to female, nonexclusive type, and exhibitionism and voyeurism. The pedophilia diagnosis was made due to Emerson's past convictions. According to Dr. Bulatao, Emerson never displayed any remorse for his past behavior.

Dr. Bulatao found Emerson has a "tendency to wax and wane"; he minimizes or justifies his crimes, has poor judgment, and has a tendency to blame others. Based on Emerson's sexual history, his minimization or justification of the crimes, his poor judgment, and his tendency to blame others, Dr. Bulatao believed Emerson was likely to reoffend.

Dr. Logan, Emerson's expert, testified his main diagnosis of Emerson would be a borderline personality disorder. When asked if he would make a diagnosis of pedophilia in Emerson's case, Dr. Logan said, "It looks like he certainly qualified for that diagnosis in the past . . .," but Dr. Logan did not make a current diagnosis of pedophilia. He discussed Emerson's previous attraction to young girls, but then explained Emerson was also attracted to adult women because he was married throughout that time period. According to Dr. Logan, the last case where Emerson had sexual interactions with a prepubescent child was in 1981. The point of Dr. Logan's testimony was to show

21

evidence that Emerson's "sexual interest took a different direction." Regarding the incident involving the 15-year-old, Dr. Logan testified, "Certainly if someone is attracted to girls who are underage but sexually mature, there are perhaps other categories you could put them" in; the sexual interaction with the 15-year-old was still a problem, but it would not be pedophilia.

When asked if Emerson's diagnosis constitutes a volitional impairment that renders him dangerous beyond his control, Dr. Logan replied:

> "[People with borderline personality disorder] can have episodes of rage. I didn't see any evidence of that in [Emerson], but it really depends on the degree to which you have it. Certainly in his state I didn't see any evidence in the past that at any point his behavior, particularly with the illegal sexual behavior, was anything that he couldn't control, and in almost every case he selected certain victims . . . . Nothing at all that would indicate any type of volitional inability to control his behavior in those type of actions."

Dr. Logan believed that although he had diagnosed Emerson with a borderline personality disorder, Emerson was relatively stable.

Dr. Logan determined Emerson had a 20% chance of reoffending, which was around the statistical average for sex offenders who were released. Dr. Logan believed the determination of whether Emerson posed a menace to the health and safety of others was a question for a jury, but he viewed any degree of recidivism as a menace to society. Dr. Logan concluded the most likely way Emerson would reoffend would be to get involved in an extramarital affair or become overly involved in looking at pornography. The least likely way Emerson would recidivate would be to revert back to an attraction to prepubescent children.

22

Considering all of the evidence in a light most favorable to the State, we find the State provided more than sufficient evidence to prove beyond a reasonable doubt that Emerson was a sexually violent predator.

Affirmed.

* * *

ATCHESON, J., concurring: I concur in the result affirming the jury's determination that in 2000 Cecil W. Emerson met the statutory definition of a sexually violent predator. See K.S.A. 59-29a01 *et seq.*